EDMOND P. BACON, LEONARD F. ANDREWS AND ALFRED B. BIDWELL, PLAINTIFFS IN ERROR, vs. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. An accomplice is a competent witness, and a conviction may be had upon his uncorroborated testimony if it satisfies the jury beyond a reasonable doubt.

.2. There is no such inflexible rule of law as that no person can be convicted on the testimony of an accomplice unless corroborated by other evidence.  It is a question for the jury who pass upon the credibility of an accomplice, as they do upon that of every other witness.  The statements of the accomplice should be received with great caution, and courts should always so advise the jury, but if the testimony carries conviction and the jury are convinced of its truth, they should give to it the same effect as would be allowed to that of a witness who is in no respect implicated in the offence.

3. The good character and reputation of a defendant among his neighbors in the community in which he resides, or has recently resided, is of value, especially in doubtful cases, and sometimes will create a doubt, when without such evidence none would exist.  Such evidence, however, is intended for the consideration of the jury, and it is for the jury alone to determine whether, when considered with the other evidence in the case, it creates a reasonable doubt as to the defendant's guilt.

4. The defence of *alibi* is decisive when duly substantiated.  It must include and cover the entire time when the presence of the ac-

cused was required to commit the criminal act charged. The evidence to support it should be carefully considered, and must be such as to satisfy the jury that the crime could not have been committed by the person thus proving an *alibi.*

5. Under ordinary circumstances a new trial will not be granted, on motion of a defendant convicted in a criminal case, on the ground that a co-defendant tried at the same time and acquitted was a material witness for the convicted defendant. Under some circumstances, as when the Judge believed the verdict to be against truth, and against the weight of evidence, new trials have sometimes been granted for such reasons.

6. A motion in arrest of judgment is not a proper remedy for a wrong verdict.

Writ of Error to the Circuit Court for Manatee county.

The facts of the case are stated in the opinion.

*J. B. Wall* and *Hartridge & Young* for Plaintiff in Error.

*The Attorney-General* for Defendant in Error.

MR. JUSTICE VANVALKENBURGH delivered the opinion of the court:

In the month of March, 1885, at the Spring Term of the Circuit Court held in and for the county of Manatee, Edmond P. Bacon, Louis L. Cato, Thomas Dryman and Adam W. Hunter, were indicted for the murder of one Harrison T. Riley, and Leonard F. Andrews, Jason L. Alford, Charles B. Willard, Joseph C. Anderson and Alfred B. Bidwell were indicted as accessories before the fact. At a special term of the court held on the fourteeth day of July, in the same year, such proceedings were had that there was severance of the defendants, and the court proceeded to try the defendants, Edmond P. Bacon, Leonard F. Andrews, Alfred B. Bidwell and Adam W. Hunter. The jury rendered the following verdict: "We, the jury, find Edmond

P. Bacon guilty of the murder of Harrison T. Riley in the first degree, so say we all. Leonard F. Andrews and Alfred B. Bidwell guilty of accessory before the fact of murder in the first degree of one Harrison T. Riley, Edmond P. Bacon, principal. Adam W. Hunter not guilty, so say we all."

The counsel for the defendants, Bacon, Andrews and Bidwell, then moved the court to set aside the verdict and grant a new trial, and in arrest of judgment for the following reasons:

First. Because the verdict is contrary to law.

Second. Because the verdict is contrary to the evidence.

Third. Because the verdict is contrary to the charge of the court.

Fourth. Because the jury failed to give the defendants the benefit of every reasonable doubt.

Fifth. Because in the case of Alfred B. Bidwell the defence can now use the testimony for the defendants of Adam W. Hunter, who was jointly indicted and tried with defendants, and who was acquitted, which is material for the said A. B. Bidwell's defence, as per affidavit filed. The affidavit of Adam W. Hunter, so filed in support of the fifth ground of such motion, was as follows:

" STATE OF FLORIDA, }
  Manatee County. }

" Before me, Clerk of the Circuit Court in and for said county, personally came Adam W. Hunter, who being duly sworn deposes as follows: That on Saturday, June 28, 1884, he was clerking for Alfred B. Bidwell, and in charge of his store, at Sara Sota; that affiant took Alfred B. Bidwell's No. 12, breech-loading, double-barrel shot-gun and gave it to Charles B. Willard, and affiant is informed that Willard gave said gun to Joseph C. Anderson; the said

gun was taken out of the store of the said Alfred B. Bidwell without his knowledge or consent.

"A. W. HUNTER."

"Sworn to and subscribed before me this 18th day of July, A. D. 1885.

"R. S. GRIFFITH, Clerk.

"By JACKSON, Deputy Clerk."

The motion for new trial was denied by the court, and the defendants brought their writ of error.

The errors assigned are: First, that the court erred in overruling the motion of the defendants for a new trial; and, Second, in overruling the motion in arrest of judgment. The motion in arrest of judgment was properly overruled; it was based upon the same grounds upon which the motion for a new trial was made. No defect was alleged in the indictment, or in any subsequent pleading. Such motions arise from *intrinsic* causes appearing upon the face of the record, and is not a proper remedy for a wrong verdict. McClerkin vs. State, 20 Fla., 879; Sedgwick vs. Dawkins, 18 Fla., 335; Hyer vs. Vaughn, 18 Fla., 647.

The only question left for us to consider is, did the court err in overruling the motion for a new trial, and to decide this it will be necessary, at some length, to examine the testimony taken on the trial.

M. A. Riley, son of the deceased, Harrison T. Riley, testified his father left home in the direction to go to the postoffice on Monday morning, about half past seven or eight o'clock. The horse on which he rode came home about one o'clock of that day. The horse came home shot through the neck with two shot. He went to see what was the matter, and found his father lying dead on his face on [the road. This was on the last day of June, 1884.

F. H. Tucker testified that on the first day of July, 1884, he saw the deceased lying just on the edge of the road, on his face, with his left arm doubled under him, and the other arm clutching grass. He was dead. Mr. Bartholomew empaneled a coroner's jury. We found where several persons had stood in the palmetto. We found where shot had cut the palmetto, and where the parties had stood on the left hand side of the road going towards the postoffice. The sign I saw, which I took to be shot holes in the palmettoes, was directly in the direction from where the parties stood in the palmettoes, towards where Riley's body was lying. It looked like two loads of shot had gone through the palmettoes, two different courses. They came from two different standpoints, going to the same point. There were signs of two people standing in different places, about four feet apart. The standpoints I speak of were in the palmettoes under some bushes. The tops of the bushes were broken away, so as to make an opening. We found, also, two breech-loading shot gun shells; one looked like it had been shot; the other had been cut in two ; also found some wads, cut wads and pressed wads, the kind you buy ; also some rag wads. The rags picked up looked to have been shot out of a gun; also found a piece of a cork, half as large as my fist, lying in the palmettoes. Some of the jury found a piece of paper out on the prairies, just beyond the palmettoes. There was blood on the paper. It looked like a knife had been wiped there. This was found about one hundred yards from where we found Riley's body.

Theodore W. Redd then testified, corroborating the evidence of the last witness, in reference to finding the shells and wads, and says: " I discovered where it looked as if two persons had been standing in the bushes, and where shot had cut through the palmettoes, and I found also some

felt wads, or hair wads; I found also some No. 12 shells, shot gun shells, and we found a piece of cloth, and there was a piece of writing paper found; it looked as if a knife had been wiped on it, and had blood on the knife." He also says that shortly after that, he was in defendant's, Bidwell's, store, and saw a No. 12 breech-loading shot gun lying on the counter; that he asked him who owned the gun, and that he answered that he did; that the wads they found looked about the size of the shells—a No. 12 wad.

W. A. Bartholomew testified that he, as coroner, held the inquest, on the body of Riley, on the first of July, 1884. The jury made an examination of the ground surrounding the body the first thing; some of them discovered in a bunch of palmetto and bushes where at least two persons had been concealed. Between the positions that those persons occupied and the body, there were shot holes in the palmettoes in two different localities. There were also palmettoes the stems of which had been bent over and nearly broken, and also twigs of bushes. On the ground between the concealment and the dead body they picked up a couple of shells, No. 12, of a breech-loading shot gun; one of those shells had been cut in two. The primer or cap of that shell was undischarged; the cap of the other had been exploded, and had indications of having had powder burned in it at least once. They picked up a number of felt wads. There were two sizes. There was a piece of cork also picked up. There was a piece of blank writing paper picked up with a piece of rotten string attached to it. It had what appeared to be blood on one side of it. "The body was next examined. The body was lying with the head to the west, the face downwards, the left hand and the arm under the body, the right arm partially extended. The body was resting on the knees, the lower part; they were drawn up, the knees were. They turned

the body over, face upwards, and then discovered that the left side of the face had a number of what appeared to be shot holes, and what appeared to be shot holes in the neck. There was a cut or incision in the neck, somewhere from near the ear to the windpipe or centre. I did not examine to see if it extended further. Further down, on the left side, in the region of the heart, there was quite a number of what appeared to be shot holes through the coat and shirt, and entering the body ; a space, probably not larger than the palm of my hand, in the coat was almost cut to pieces, one shot evidently cutting into the other. In examining the body further, the clothing was opened in front and the pants and drawers. The flesh had a spongy appearance as if wind had gathered on the other side. I was standing right over the body. The shot holes were such a size as buckshot would make. I cannot say whether the buckshot were the largest, the smaller, or the medium. The size where a shot had passed through the palmettoes, I could say as to the size of that nearly. The size would be what is known as single or double 0. There were two sizes went through the palmettoes, one was larger than the other. The shot that hit the body in the breast were too close together to identify the size. All must have gone in in a wad. From what I saw, I would say those shot were low-mould buckshot. They are a smaller buckshot than those I have mentioned. There were some of the shot that had entered in the outer edge had gone in separately, but the larger bulk of them had gone in together, making a larger wound. I would not like to state the size, as it was not measured. The hole a person could probably put three fingers in it. The larger of the wounds was in the regson of the heart. There were, also, a couple of shot holes in one of his hands."

Council F. Brown testified in substance that he knew all

of the defendants; that on Saturday night before the killing of Riley he was ordered to go to Alford's house; he went and there were present Dr. Andrews, A. B. Bidwell, Alford, Miles A. Brown, Ed. P. Bacon, Thomas Dryman, old man Fletcher, Charles Willard and Joseph C. Anderson. "The purpose for which I was ordered to go there was, that some parties were to go there for waylaying this man, Harrison T. Riley, and killing him." "There was a secret organization, and I belonged to that organization. Dr. Andrews and Jason Alford made a detail. The reason I went to that house that night was, it was a meeting and we were called together by order of the officers. The officers were: Dr. Andrews and Mr. Bidwell were the Judges; Jason Alford was the Captain; Charles Willard acted as Lieutenant, and Louis Cato also as Lieutenant. Alford was the officer that ordered me to meet there at that point. After they had talked a little while, Dr. Andrews said there is business on hand and it's got to be done. He then turned to Alford, and says he, Jase, make your detail. Alford: make it yourself. Dr. Andrews then detailed Ed. P. Bacon, Thos. Dryman, Louis Cato and my brother, Miles A. Brown, to go to the saw grass, where Riley is said to have been killed. My brother was taken sick and did not go. There were other details made. I, myself, was detailed to go with the Captain, Jason Alford, and Dr. A. W. Hunter, to a foot log on Phillipi creek, above the bridge, said to be; I have never seen the log. We were to go there to see if Riley came that way. Then the Captain was to give orders what to do; then I was at his disposal. Joe. Anderson and Charles Willard were to go to the horse ford, known as Brown's Crossing. That was the arrangement that night. There is a little more to be added to it. After Andrews had made the detail he told Dryman to go into a little house in his orange

grove, and there he would find his double-barrel gun, and the words he used were, she will be damned well charged, and for him to take her and use her on Riley if he came that road, and, says he, my orders shall be obeyed, and if they wasn't obeyed, death was them boys' portion." I became a member (of the organization) sometime in April, 1884. There was an oath. "The night I joined, I went to the steps of Alford's big house, there I was stopped, and me and my brother, Miles A. Brown, were together; we both went into it the same night. Louis Cato tied a handkerchief around my eyes, and led me into a room. Then they told me to get on my knees. When I walked into the room Mr. Bidwell told me to get on my knees. He was Judge at that time. I don't remember the point blank words he spoke to me when he took off the handkerchief. Then he made me hold up my right hand and read the oath. The oath I cannot remember what it was. It was the tighest oath I ever swallowed in my life. I can remember probably a word here and a word there, but as it come I don't remember it. The oath contained that we should stick to each other, we had to obey the officers of the organization under the penalty of death, any orders they gave, unless sickness prevented." "The meeting held this Saturday night was not the only meeting at which Harrison T. Riley's death was mentioned. We had a meeting at Alford's burnt place, so-called, sometime previous to that, a week or two weeks. At that meeting Dr. Andrews, says he, Riley has got to die, Riley has got to die. No other thing was done that night that I remember than what I have stated with reference to H. T. Riley."

Miles A. Brown testified that he was present at the meeting on Saturday night before Riley was killed; that Dr. Andrews, Jason Alford, C. F. Brown, E. P. Bacon, Louis Cato, Thomas Dryman, Dr. Hunter, Mr. Bidwell, Mr.

Fletcher and James Fletcher was present.  " I was present because I was sent for, because he, Andrews, as he said to me afterwards, wanted to hold a meeting to dispose of Riley.  He ordered a meeting of an organization.  I do not know as I could explain the organization, but it was gotten up as a Democratic organization, so Mr. Andrews said. It had no name that I ever heard.  I could not say when it was organized.  I could not give you the date of my becoming a member.  I became a member before the alleged killing of Riley."

He testified that the meeting at which the detail was made was Saturday night before the Monday morning when Riley was killed.  " There were Judges of this organization.  The Judges were Mr. Bidwell and Mr. Andrews. They both presided at the meeting .that night.  By presiding, I mean they both were there.  At this particular night Dr. Andrews was chairman.  Dr. Andrews said at the meeting that night ' there was work to do,' and Jason Alford said, ' well, what is it doctor ?'  Dr. L. F. Andrews said, ' old Riley has got to die,' and Mr. Bidwell said that's business."  In his further testimony as to the detail he corroborates the testimony of Council F. Brown.  On his cross-examination, he said:   " I did not go to the meeting of the detail.  I said all the time I was sick.  It was enough to make any man sick.  I was taken sick on Saturday night going home from the meeting.  I was sick until Sunday night.  On Monday I got on my pony and went three miles, in an opposite direction to where Riley was killed, to old man Blackburn's.  I suppose it made me feel better that I was relieved from that, though I was in danger of my life."

Louis L. Cato was then sworn, and after being instructed by the court that he could refuse to testify to anything that would criminate himself, and that what he said freely and

voluntarily could be used against him in any proceeding that the State might bring against him, testified in substance: " I belonged to an organization at Sara Sota with a number of twenty-two members. That organization was carried on from one meeting to another until it was the cause of Harrison T. Riley's death." With reference to the meeting at which Riley was sentenced to be killed, he says: " Dr. Andrews and Mr. Bidwell gave the orders to Jason Alford. Dr. Andrews said that this man Riley had to be killed, to be put out of the neighborhood ; I mean Riley ; said that he was taking property that did not belong to him from orphan children. Mr. Bidwell never said a word, except he seconded what Mr. Andrews said. Bidwell said, yes, it will have to be done. Dr. Andrews did the principal talking. The orders were given to Jason L. Alford, Captain. I held the position of first Lieutenant. I was the first man that was put on the detail. Ed. Bacon was the second man ; I think Council F. Brown was the next one, and Thos. L. Dryman was the next one ; I think Miles A. Brown was the next one ; Joe Anderson was the next one. Alford said that Thos. L. Dryman, Ed. Bacon and myself should go to a pond out east of Dr. Andrews' house, about northeast. I remember there was another party on the detail—Adam W. Hunter. Hunter and Alford were to go to a foot log on Phillipi creek. Council F. Brown, Miles A. Brown and Joe Anderson were to go to the same pond east of Dr. Andrews' house that I spoke of. Alford told us all that he detailed that we should have guns, and they well loaded. Miles Brown said he did not have any gun. Mr. Bidwell said he should have his, which was a breech-loading shot gun, No. 12, if I mistake not. Thos. Dryman said he had no gun either. Dr. Andrews said he would give him his son's gun. Alford gave the orders then how he should be killed.

He said that he, H. T. Riley, was to be shot, and his throat cut." This meeting was held on Saturday night, and Riley was to be killed on Monday Morning. "There were at that meeting Mr. A. B. Bidwell, Dr. L. F. Andrews—he was one of the Judges—Mr. Bidwell was the other Judge, Captain Jason Alford, myself, Ed. P. Bacon, Thos. L. Dryman, Council F. Brown, Miles A. Brown, J. C. Anderson, John A. Fletcher, Dr. A. W. Hunter. That is all that was at that meeting that night, if I remember aright." When they left the meeting "the expectation was for them that was ordered to kill Riley, to do it—the ones put on the detail; if one party did not get him the other should. There were some taken out of the number to go to the pond, that left there to go down to the place where I was to go—Thomas L. Dryman, Ed. Bacon and myself. The man Riley came along the road I was stationed on, myself, Ed. P. Bacon and Thos. L. Dryman; when he got a little past us we all three fired at Riley; we ran out to where he was lying on his back; he was not moving hand or foot; he was making a noise though I am certain he was not breathing; the noise was in his stomach, a sort of gurgling noise; Edmund Bacon fired the fourth gun, and I ran up and cut his throat. We all then got away from the place as quickly as we could." In relation to the meeting, at which the detail was made, he says: "It was part of the business of Dr. Andrews to report to Bidwell, after he heard the guns, that Riley was killed. The understanding was, at the meeting, that the ones that did the work—the shooting—should report to Dr. Andrews, Jason L. Alford or Mr. Bidwell, that the order had been executed. They were not allowed to report to any other member of the organization, only to the Judges or Captain." "Riley was dead before the throat was cut; he was riding at the time he was first shot; he fell off his horse at the time the

guns fired, the three that were fired first by Bacon, Dryman and myself. We had that to do, the killing of Riley, to save our own lives. They, Dr. Andrews and Bidwell, Judges, said if we didn't do it we would have to be done the same way." "I know Ed. P. Bacon used A. B. Bidwell's gun. It was a breech-loading shot gun, No. 12 was the cartridge it shot. The reason I know the gun, it had a pistol-grip on the stock. That was the only breech-loading shot gun, pistol-grip, I knew of in the neighborhood where I lived. I had the gun in my hands several days before Bacon used it. I fired the gun also at marks, at a pine tree once, at Mr. Bidwell's store. Judges of the organization were to preside at all meetings, administer all oaths, and read the by-laws every time. If one was not there the other had to do it. They were to make all orders for any work to be done, for any man who was to be whipped, or anything of that kind, or any man to be killed. That was their duty, to make all orders, and they were to talk to outside men to get them into membership. That was one of the by-laws. They were all numbered. They were to talk to men and be more than careful how they approached them for membership, and sound them in general standing as to their back-bone and grit before he was brought in for membership." "When I became a member of that organization, I did not take an oath at that time, nor till six weeks or two months after. There were oaths administered, before the killing of Riley, to members initiated. I do not know that I can repeat it just as it was. I saw A. B. Bidwell the evening of the day Riley was killed, at his store. I had a conversation with him about the killing of Riley. He said it was a good thing. I told him Bacon, Dryman and myself had done it, and executed the order. He said we had been wanting the old devil or scoundrel, or some such remark, out of the

way for a long time. He said he was out and it was satisfactory. I am stating just what Mr. Bidwell said to me. * * * ." He further testified that they met on Saturday night previous to the killing of Riley, in a room about 12 or 16 feet square, in a frame house known as Jason Alford's new house. "Bidwell was about six or eight feet from me, sitting on the east side of the house; he had a parcel in his hand, and some papers, and was sitting to a box or table; he seemed to be writing down what passed in the meeting. He was sitting about four feet from L. F. Andrews. Andrews stood up part of the time, and sitting the other part. When he spoke he would stand up. A. W. Hunter, I reckon, was twelve feet from Dr. Andrews. He was sitting on the south side of the house close to the chimney. There was an oath taken which bound the members to execute the orders of the officers." "When Riley was shot, and the first three shots were fired, we were secreted in some bushes twenty steps from the road he passed on."

Thos. L. Dryman, after being duly instructed by the court, as in the case of the witness, Cato, testified: "I knew Harrison T. Riley; I knew Edmond P. Bacon, Adam W. Hunter, Alfred B. Bidwell and Leonard F. Andrews. I was present at a meeting held in one of the Alford houses the Saturday night previous to the Monday Riley was killed. That was a meeting of an organization known as the Sara Sota Vigilance Committee, styled S. S. V. C. The members were, first, Jason Alford, Dr. Andrews, (identifies him,) Alfred B. Bidwell, John M. Tippett, Frank Jones, Dr. Hayden, Edmond P. Bacon, Joseph C. Anderson, John Fletcher, James Fletcher, Lucien Belk, Thomas Dryman, Bob Smallwood, Council F. Brown, Miles Brown, John Trowel, —— Bartholomew—I don't know him by his given name; that's all I can remember; Dr. Hunter was a member at

that time; Charles Willard ; —— Bartholomew joined after the killing of Riley. All that I have mentioned were not members before the killing of Riley * * * ; all except Smallwood, Tyler, Bartholomew and Trowel were members before the killing of Riley. There were present at the meeting, the Saturday night before the killing of Riley, Jason Alford, Dr. Andrews, Alfred B. Bidwell, Ed. Bacon, Louis Cato, A. W. Hunter, C. F. Brown, Miles Brown, Thos. L. Dryman, Joseph C. Anderson. I don't remember whether there was any more or not. That night at the meeting Dr. Andrews proposed to kill Riley. He said that H. T. Riley was a mean man, and was doing all kind of devilment, and had poisoned the woman he had been living with. At that time she was dead ; that he was making preparations to sell an orange grove that he, H. T. Riley, had taken from the Sergener heirs by his damned rascality. Jason Alford said that it would be a good thing to get him out of the way. Mr. Bidwell said the same thing ; Mr. Bidwell said that he ought to be gotten out of the way, and to be killed for his rascality. Jason Alford, Dr. Andrews and A. B. Bidwell made a detail to kill him. Dr. Andrews proposed it first. There was detailed Louis Cato, Ed. Bacon, Joseph Anderson, C. F. Brown, Thos. L. Dryman, Miles Brown, A. W. Hunter and Jason Alford. We, who were detailed, were ordered to go to the end of a pond northeast of Dr. Andrews' house, about ¾ of a mile; we were ordered to be there by sun up on Monday morning following, except Dr. Hunter and Jason Alford ; they were to go to a foot log on Phillipi creek, with the expectation of killing Riley if he passed that way ; yes, I obeyed the orders ; Ed. Bacon went with me to the place ; Louis Cato came shortly after we arrived at the place ; we all three had guns; I had Dr. Andrews'

gun—Dr. Andrews, the defendant here; I got the gun from a small house in his orange grove where he put it; when the detail was made he wanted to know who had guns and who had not; I told him I had none; he told me that he had one, and that he would loan it and put it in the small house in his orange grove, for me to get it; he told me he would have it ready there by daylight, so that when I came for it, it was there and I took it off. Ed. Bacon, Louis Cato and myself were standing on the road at the place that Jason Alford, Dr. Andrews and A. B. Bidwell told us to be stationed, and when H. T. Riley came along by the place we all shot him at once. Afterwards, we all three moved towards him; I went half way from the place where the shooting was done to where he fell and stopped; Ed. Bacon shot him again; this made the fourth shot; Louis Cato cut his throat; we turned around and went the way we came." He further testifies that he saw Dr. Andrews after the shooting, and the Dr. asked him if they had done the work they were detailed to do; "I told him we had; he asked me how many were there; I told him Ed. Bacon, Louis Cato and myself; he asked me how it was done, if we did it according to how we were detailed; I told him we did; he said then he was going down to the store and we would go together; we went to the store together. The night that the detail was made there were orders to this effect: Whichever one of the Judges or Captain heard it first was to report to the others. That was in order to know whether it was done or not according to their orders, and if it was not done we had to abide by the by-laws. Bacon had a breech-loading shot gun, I don't know what calibre; it was a double-barreled shot gun."

This is the substance of the evidence on the part of the State against the defendants. The defence then introduced one witness to prove an *alibi* on the part of the defendant,

A. B. Bidwell. George N. Shepard testified, in substance, as follows: "I knew A. B. Bidwell in June, 1884; I lived in his house at the time; I remember the day on which Riley was alleged to have been killed; I was at Bidwell's store the Saturday prior to that; Bidwell was there; I remained at Mr. Bidwell's house from after closing the store until next morning; the store closed that night about seven o'clock—I should judge between six and seven; I remained with Bidwell continuously that night until he retired, I should judge between half-past nine and ten o'clock—about ten o'clock; Bidwell went to the house with me; I swear positively I was in company with A. B. Bidwell from sundown Saturday, prior to the alleged killing of H. T. Riley, until half-past nine or ten o'clock that night, or until he retired; during the month and the month previous to the killing of Riley I owned a double-barreled breech-loading shot gun, No. 12 gauge; it was a pistol-grip gun; my gun was not used to shoot Riley."

Edmond P. Bacon, one of the defendants on trial, then made his statement on oath, the substance of which was that he belonged to a secret society, of which Dr. Andrews, Louis Cato, John Fletcher, Alford, Charles Willard, George Tyler, Tom Dryman, the two Brown boys, old man Tippett, and old man Fletcher were members; they had a meeting at the burnt place, and they got to talking something about old Tip. Riley; some opposed it, and some wanted to do it; they adopted some by-laws and oaths; "I cannot give them." He was present at the meeting on the Saturday night before Riley was killed. Alford made a detail of seven men to kill Riley; they were Louis Cato, Thos. Dryman, Coot Brown, Miles Brown, Dr. Hunter, and Alford, himself, and Bacon; Bacon and Dryman went to the place, and met there Lieutenant Cato; he picked out the place and cut

away some palmettoes and bushes; says he, " damn him, when he comes along, we'll get him ;" we saw him coming, and he says : " when he gets abreast, and I give you orders, you obey it ;" we done so ; we shot ; I shot the second gun ; that's the only one I did shoot, and went out to the place where he was struggling ; Cato throwed up his gun to his face and it wasn't loaded, one barrel did not go off ; he turned around to Dryman ; Dryman shot at him ; I think he shot about ten feet over him ; he was so badly scared he did not know which way he was shooting; by this time Riley was upon his knees, pulled up by some palmettoes ; Cato pulled out his knife, run up to him, caught him by the beard, and turned his head back and commenced cutting on his throat ; he said he had a damned tough hide. He further says that Mr. Bidwell was not at the meeting on the Saturday night before Riley was killed.

L. F. Andrews, one of the defendants, was then sworn, and made his statement, in substance as follows : " Jason Alford, in the month of May, 1884, told him, Andrews, that he was getting up a social club ; Andrews asked him, what do you mean ? Alford said, there is a great deal of slander in this section of the country, and I think we can get up a club that will use the influence of good men to do away with it, and make peace and harmony among the citizens ; subsequently, and about two weeks afterwards, Andrews met Alford and, in renewing the conversation, Andrews said he wanted to know the names of the parties in the club. Alford mentioned J. F. Tippett, Parson Redd, Mr. Elmer, Mr. Rawls, old man Tatum, John Tatum, Jesse Knight's boys, Mr. Murphy, and Mr. Wilson; we met Mr. Tippett; I asked Mr. Tippett about the club ; he said it was all right, that it was for the best interest of the citizens and peace and harmony. That decided me, because Mr. Tippett was deacon in the church." He joined the organi-

zation in the first week in May; he went to attend court
at Pine Level as a witness for Jason Alford, who was
charged with killing a cow; on the way out they camped
for dinner; Riley came up on horseback; he had a suit in
court, The State against him, for adultery; Alford remarked
that he did not want that man Riley to associate with him
any more, that there would be trouble; he told Riley
when he got to Pine Level to keep out of the way and not
come near Alford; he subsequently attended a meeting of
the organization after he got home, where Mr. Riley was
talked about being strapped, because the court had turned
him loose in case of his adultery; Charles Willard said if
that is what you are going to do, I am not in; "I got up
right after Willard, and I told them it never would do, and
I talked to them, told them the condition in which Mr.
Riley was situated ; that if they went out to his house to
whip him, or anything else, they would get hurt." The
next meeting he attended was that on Saturday night be-
fore Riley was killed; "the subject of whipping Riley
came up again, and Jason Alford made a motion to
that effect; before putting the motion, when I got
there that evening, I was chosen chairman, not judge; I
put the motion as is usual in all societies, then called
for remarks on the question; no one said anything; I
told them, and referred them to the previous meeting when
the same question was up, that it would not do. Jason
Alford was very headstrong and would not submit; there
was nothing said about killing Riley in my presence; I
went home; I did not know until I got into prison how
that thing was arranged. After we broke up Alford called
a meeting in the big house, as testified to; the other, or
first meeting when I was there was not in the house; it
was down the beach in a small frame house which Mr.
Alford owned, bought from a man by the name of J. J.

Brown; the meeting in the big house, I was not there. I know another fact connected with that, that Mr. Bidwell was not there, because I waited on him in the evening; he had been sick with an attack of billious colic at the store and went home; I saw him go. The result of that meeting developed itself, as has been testified to here by parties, I don't know what you call them, turning traitors, or something." My business was practicing medicine; I was here and there, waiting on my patients, sometimes going all night and sometimes all day, as the cases required." He further says that the last meeting was held on the last Saturday of July, 1884; that at that meeting Dr. Hayden and L. L. Cato brought up the subject of whipping old man Lowe; they all put it down but two. " The officers of the organization have been stated to you, consisting of Chairman, Captain and Lieutenants. The term Judge was not used in the sense of Judge; it was an appellation given to the Chairman by way of distinction; other members had nicknames. The duties of the Chairman were just the same as that of any organized secret society, nothing more; I never gave an order, and I raise my hand in oath, to kill, or detail a set of men to kill any man; it was not our business." In his statement, he further details the character of Riley; says that during that winter and spring there was not a man or woman in the neighberhood who did not say but that Riley ought to be severely punished for his conduct; that it was a noted fact in that section that he was a desperate character; that a widow became pregnant by him; that he was living in open adultery with her; that he, the Doctor, was called to treat her in her sickness; that she had symptoms of arsenical poison, and that Riley told him that he had poisoned her; she died.

Adam W. Hunter, another of the defendants, was then

sworn, and made his statement, in substance as follows: In April or first of May he joined the club; he was then clerking for Mr. Bidwell; he attended the meeting; A. B. Bidwell, L. F. Andrews, Louis Cato, Dr. Hayden, John Fletcher, Jas. Fletcher, Miles Brown, Council Brown, Jason Alford, Jos. Anderson, C. B. Willard, John Tippett and perhaps others; Dr. Andrews was Chairman; there was nothing said the night he joined, except of a political character. The next meeting was at · what was called Burnt Place; after the political discussion was over with, Dr. Hayden suggested that something ought to be done with Riley, and some one, either him or Cato, asked if they could get volunteers from the body to take him out and give him a good licking; Charles Willard said he would never enter into a thing of that kind, and should such action grow out of that club he would resign his membership; he, Hunter, remarked that he endorsed Mr. Willard; all favored except Cato and Council Brown; they were in favor of it; Dr. Andrews said that a good whipping would help him, but they had better let him alone; Mr. Bidwell was not present at that meeting; next day at the store he told Mr. Bidwell what had occurred at the meeting, and that he, Hunter, would not attend any more; Bidwell agreed with him and they promised each other not to attend any more meetings; he says he never took the oath; he knew nothing of the meeting in regard to the killing of Riley.

Alfred B. Bidwell, one of the defendants, after being sworn, made the following statement in substance: "In April, 1884, Alford asked him if he would not like to join a political and social organization; he said it was for political purposes, and to see if they could not have a better feeling in that neighborhood among neighbors; the next week he went to Alford's house, and found there Mr. Alford,

Louis Cato, Dr. Hayden and Joe Anderson; he was made chairman of the meeting; Mr. Alford made some political remarks, and after one-half or three-quarters of an hour they adjourned. A week or so after that he was called upon by Cato and Alford to attend another meeting at Alford's house; there were many men in attendance; he could not call the names of all in attendance, but he mentions Willard, the two Browns and Dr. Andrews; the conversation was general; some motions were put to the meeting; some members were proposed; committees were appointed; next day Alford brought down the obligation for him to copy; he said he thought he could repeat it very correctly, and did so as follows: " I, ————, of my own free will, and for the protection of myself, and all good and worthy citizens, wish to become a member of this organization. I promise that I will keep all the secrets of this organization, and not reveal them to any one, except it be a member. I also promise that should a member of this organization get into trouble I will espouse his cause, be he right or wrong, except where fraud or crime, if in my power so to do. I also promise I will not wrong or cheat a member of this organization to the value of anything knowingly, or suffer it to be done by another, if in my power to prevent it. I also promise that I will not speak evil or slander a member of this organization before his face or behind his back, nor suffer it to be done by another, if in my power to prevent it. I also promise I will not strike a member of this organization so as to draw blood; to all of which I sincerely promise and swear, so help me God." The next meeting he attended was at Phillipi Creek; he read over this obligation which he had copied; he was not feeling well and resigned his position as chairman to Dr. Andrews; the next meeting at which he was was at the ship yard; they had a little conversation and went home. Hunter, after

returning from a meeting one night that he had not attended, had a conversation with him, Bidwell, and they thought the organization was drifting into a course they did not like, and they resolved not to attend any more meetings, and he says: " I never did attend any more." He says that on the Saturday night, on which it is alleged the meeting for the killing of Riley was held, he was not present; he says " that morning I was taken sick with an attack of bilious colic at the store; Hunter prescribed for me in the morning, and I felt much better, and attended to business until along in the afternoon; Dr. Andrews came into the store and gave me some medicine, and told me I had better go home, along about six o'clock in the afternoon; Mr. Shepard and I went along home, and left Hunter in charge of the store; Hunter was clerking for me then; after tea, at home, Mr. Shepard, I and my wife, were on the porch until about ten o'clock, and after I went to my bed room my wife put some poultices on me; I felt better on Monday morning." He went to his store, and about one o'clock went home and went to bed, and did not get off his bed for four weeks; Dr. Andrews was his physician; he says he never gave his consent to Brown, or any other person, to use his gun; if it was taken or used at all he did not know it; Shepard had a gun as nearly like his as could be; there was no such officer in the organization as judge; the name was given to me by members outside of the organization as a sort of compliment. " The question of killing any person or assassinating any one, was never brought up at any time, or at any meeting that I attended; I never knew or heard of any by-laws connected with the organization; never heard of any talked of until I had been in prison; no word or communication was ever brought to me of the killing of Riley; I never knew of his death until Alford came to

my house when I was sick, the Tuesday or Wednesday following; I never knew who killed Riley until I heard Mr. Cato's testimony; I was never in the vicinity where Riley was said to have been killed; I never crossed Phillipi Creek, and I know nothing of the locations they speak of; never was at Dr. Andrews' house, or in the vicinity of his house."

The defendants' attorneys caused a commission to be issued, and the evidence of certain persons, who resided in the city of Buffalo, and State of New York, was taken, as to the reputation and general character of the defendant, Alfred B. Bidwell. This evidence was then read to the jury, the substance of which is as follows:

Charles Beckwith says that he is one of the Judges of the Superior Court of Buffalo; "I made the acquaintance of Alfred B. Bidwell in the year 1853; he resided in Buffalo, N. Y., until about eight years ago, when he went to Florida; I was intimately acquainted with him; his residence was in Buffalo until he left for Florida, seven or eight years ago; I knew his general reputation in the city of Buffalo, and in the community in which he lived, as a peaceable, honorable and law-abiding man and citizen; that general reputation was good during all the time of my acquaintance; I was well informed as to his business affairs and relations, the reputation he bore among his fellow-citizens, and his social standing in the community where he lived, and during all that time, his reputation as a peaceable, honorable, law-abiding man, was above reproach and beyond question; he had been married a number of years prior to his leaving Buffalo, but it was understood that he was divorced from his wife; at least, they separated some time prior to Bidwell's leaving Buffalo; she went off, as it was reported, to California."

James M. Smith says he resides in the city of Buffalo,

Erie county, New York, and is one of the Judges of the Superior Court of Buffalo; he had known Alfred B. Bidwell for upward of twenty years intimately before he moved from Buffalo, about the year 1876, to Florida; "I knew his general reputation in the community in which he resided as a peaceable, honorable, law-abiding man and citizen; I never heard anything against him, nor any imputation of of any kind against his character."

John C. Graves, Clerk of the Superior Court of Buffalo, says he knew Bidwell in Buffalo, about eighteen years; Bidwell resided there until he removed to Florida in the latter part of the year 1876; he knew the general reputation of Bidwell, and it was an excellent reputation as a peaceful, honorable and law-abiding citizen; it was understood in the community that he and his wife had separated, and that she had gone to California.

Joseph E. Barnard, Comptroller of the city of Buffalo, says he knew Bidwell; became acquainted with him in 1866 or 1867, and knew him until he went to Florida; knew his general reputation in the community where he lived; his reputation was first-class in every respect; "everything I knew about him indicated that he was held in high respect."

A commission was also duly granted and issued to take testimony in the State of Iowa, as to the reputation and general character of the defendant, Leonard F. Andrews. This evidence read to the jury is substantially as follows:

L. O. Runig: Knew Leonard F. Andrews in Lewis for about five years; part of the time he lived in Lewis, Iowa, and part of the time within five miles of Lewis; "I knew him intimately; he moved from there about three years since; I knew his general reputation, and it was good, as good as any other citizen; he was a law-abiding citizen."

R. W. Macomber says: "I knew Leonard F. Andrews in

Cass county about five years; was intimately acquainted with him; he left the county I think in 1881 or 1882; I knew his general reputation; it was of being a peaceable, honorable and law-abiding citizen; he never had any other reputation here, and was highly esteemed as a citizen."

M. J. Davis says: "I knew Leonard F. Andrews; he resided in Cass county, Iowa, about five years; I think he left about the year 1880; was very well acquainted with him; I knew his general reputation in the community where he lived; it was good."

Oliver Mills: Knew Andrews for about six years in Cass county, Iowa; "I was quite intimately acquainted with him; I knew his general reputation; it was excellent, none better."

J. S. Reshel says: " I knew Leonard F. Andrews while living in Lewis and vicinity, in Cass county, Iowa, for a period of five or six years, from the year 1876 until he moved to Florida; he moved to Florida in the fall of 1881; I knew him well and intimately; his general reputation in the community was that of a peaceable, respected and law-abiding man."

George Elsey says: " I knew Andrews; he resided in Cass county, Iowa, about six years; I think he moved away in 1881; I was intimately acquainted with him; I knew his general reputation when he resided here; he had the general reputation of being a quiet, peaceable and orderly citizen."

The court then charged the jury, a copy of which charge is embodied in the record, and to which charge no exceptions were taken by either party. Upon the subject of an *alibi*, the court charged as follows: " A defendant has a right to prove by competent evidence that he was not present and could not have committed the crime. If, from

the evidence, you believe that he was not present, you must acquit. The evidence of an *alibi* must cover the whole time when the presence of the accused was required. You must determine whether from the evidence the defendant has proved that he was not there or not. If you have a reasonable doubt in your mind as to whether he was there or not, you must find him not guilty. The defence of *alibi* is, of all others, the most decisive when duly substantiated; but the evidence adduced in support of it requires to be minutely considered, and must be such as to render it impossible that the crime could have been committed by the party that claims that he was not present, and could not be guilty as charged." Again the court charged the jury: "Defendants have a right to put in evidence as a defence their good character. This should be considered by you in connection with the rest of the evidence, as part of the whole, from which you are to determine your verdict, and it should have such weight and effect as you, in connection with all the evidence, believe it entitled to. Accomplices in a crime are competent witnesses against a co-perpetrator of the crime, and their evidence should be weighed by the jury, though uncorroborated, and given such weight as the jury believe it entitled to. If their testimony is corroborated by other testimony it should be entitled to greater weight than if uncorroborated. While the testimony of accomplices should be received with caution, especially if uncorroborated, still it should not be rejected, if not corroborated in every material statement, if the jury believe that it is entitled to any weight. You are the judges of the credibility of the statements of the accomplices, and must give them that weight that you believe they should have, on viewing the whole evidence. Parties accused, in all criminal prosecutions, have the right to make, under oath, before the jury, statements of the matters of his

or her defence. Such statements when so made are for the jury alone, and to be taken by the jury into consideration in connection with all the evidence in the case, and to be allowed such weight, and such only as you, in your judgment, may see fit to give them. The accused are entitled to the benefit of any reasonable doubt you may have in regard to their guilt or innocence. If you have such reasonable doubt you must find a verdict of not guilty. By reasonable doubt is not meant a possibility of a doubt, but it must be a reasonable doubt, one conformable to reason, a doubt which would satisfy a reasonable man. It is that state of the case which, after comparison and consideration of all evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." This certainly is good law, and covers the whole ground to which it applies. There was no exception taken, on the part of the defendants, to the admission of any of the evidence, any ruling of the court, or any part of the charge. The entire charge was clear and lucid, and covered the whole case.

The rule, as laid down by Mr. Greenleaf in his work on evidence, is as follows: "The degree of credit which ought to be given to the testimony of an accomplice is a matter exclusively within the province of the jury. It has sometimes been said that they ought not to believe him, unless his testimony is corroborated by other evidence; and, without doubt, great caution in weighing such testimony is dictated by prudence and good reason. But there is no such rule of law; it being expressly conceded that the jury may, if they please, act upon the evidence of the accomplice, without any confirmation of his statement." Greenleaf on Evidence, §380; State vs. Litchfield, 58 Me., 267.; People vs. Cook, 5 Parker's Crim. R., 351; Wixson vs. The People, 5 Parker's Crim. R., 119.

In the case of The People vs. Castello, 1 Denio, 83, Judge Beardsley, speaking for the court, says: "The woman, Marache, was offered as a witness for the prosecution, but objected to as an accomplice in the crime, and, therefore, incompetent. This objection was overruled, and in the charge the jury were instructed that they 'could lawfully convict the prisoner on the testimony of Toulena Marache alone, and uncorroborated.' To this decision and instruction the counsel for the defendant duly excepted. Conceding Marache to have been an accomplice, in the strict sense of that term, she was still a competent witness for the prosecution; of this there can be no doubt. And although it has often been said by Judges, and elementary writers, that no person should be convicted on the testimony of an accomplice unless corroborated by other evidence, still there is no such inflexible rule of law. It is a question for the jury, who are to pass upon the credibility of an accomplice, as they must upon that of every other witness. His statements are to be received with great caution, and the courts should always so advise; but after all, if his testimony carries conviction to the mind of the jury, and they are fully convinced of its truth, they should give the same effect to such testimony as should be allowed to that of an unimpeached wisness, who is in no respect implicated in the offence. Such testimony will authorize a conviction in any case."

In the case of Rex vs. Jones, 2 Camp., 131, Lord Ellenborough said: "No one can seriously doubt that a conviction is legal, though it proceed upon the evidence of an accomplice only. Judges, in their discretion, will advise a jury not to believe an accomplice, unless he is confirmed, or only in as far as he is confirmed; but if he is believed, his testimony is unquestionably sufficient to establish the facts which he deposes. It is allowed that he is a competent

witness; and the consequence is inevitable, that if credit is given to his evidence it requires no confirmation from another witness. Within a few years a case was referred to the Twelve Judges, where four men were convicted of a burglary upon the evidence of an accomplice, who received no confirmation concerning any of the facts which proved the criminality of one of the prisoners; but the judges were unanimously of the opinion that the conviction of all four was legal, and upon that opinion they all suffered the sentence of the law. The King vs. Atwood, *et al.*, 2 Leach, 521. Strange notions upon this subject have lately got abroad, and I thought it necessary to say so much for the purpose of correcting them."

In the case of Jordaine vs. Lashbrooke, 7 Durnf. & East, 609, Grose, J., in commenting upon the law, as laid down by the Twelve Judges, in The King vs. Atwood, *supra*, says: "This was not new law, nor founded upon a new principle, for in 1 Hale, 303, 304, 305, there are different instances of convictions on the evidence of accomplices." Rex vs. Hastings, 7 Car. & Payne, 153; Regina vs. Stubbs, 33 Eng. Law and Equity, 551.

Phillips, in his work on evidence, says: "The evidence of accomplices has been at all times admitted, from a principle of public policy and from necessity, as it is scarcely possible to detect conspiracies, and many of the worst crimes, without their information. In the case of Charnock, who was tried for high treason in the time of William III, Lord Holt said, in his address to the jury, 'conspiracies are deeds of darkness as well as of wickedness, the discovery whereof can properly come only from the conspirators themselves, and the evidence of accomplices has always been allowed good proof in all ages, and they are most proper witnesses, for otherwise it is hardly possible if not altogether impossible, to have a full proof of such

secret contrivances'; and he adds, 'such discoveries are to be encouraged in all governments, without which there can be no safety.'" Again, he says: " Since accomplices are competent with witnesses, it necessarily follows that if their evidence is believed by a jury, a prisoner may, strictly speaking, be legally convicted upon it, though it be unconfirmed by any other evidence as to his identity."

In Commonwealth vs. Bosworth, 22 Pick., 397, Morton, J., delivering the opinion of the court, says: "It is competent for a jury to convict on the testimony of an accomplice alone. The principle which allows the evidence to go to the jury necessarily involves in it a power in them to believe it. The defendant has a right to have the jury decide upon the evidence which may be offered against him, and their duty will require of them to return a verdict of guilty or not guilty, according to the conviction which that evidence shall produce in their minds." The court then cites 2 Haw., P. C., 46, §135 ; Hale's P. C., 304, 305 ; Roscoe's Crim. Ev., 119 ; 1 Phill. Ev., 32 ; 2 Starkie Ev., 18, 20.

In the case of Sumpter vs. The State of Florida, 11 Fla., 247, this question was settled by this court. In the opinion, Judge Douglass says: " The rule of evidence laid down by Lawrence, Judge, in the case of Jordaine vs. Lashbrooke, 7 Term Rep., 601, is that " all persons are admissible witnesses who have the use of their reason, and such religious belief as to feel the obligation of an oath, and who have not been convicted of any infamous crime, and are not influenced by interest." It is not enough that a person may have committed an infamous crime, and that he may have confessed it. These facts may seem to destroy his credibility before a court and jury and may render his testimony of little avail in the estima-

82 SUPREME COURT.

Edmond P. Bacon et al. v. The State of Florida—Opinion of Court.

tion of the latter, who are the exclusive judges of it; but the rules of law will not, on this account, authorize the court to exclude him from giving his testimony. It will be seen from the above rule, which is believed to be well established law on the subject, that a *particeps* in the very crime with which the prisoner is charged, is competent to prove the guilt of the prisoner, and this position is sustained by ample and weighty authority."

In Indiana it is held that "a jury may convict upon the testimony alone of an accomplice." Dawley vs. The State, 4 Ind., 128; Agnes vs. The State, 88 Ind., 275.

In Illinois the same rule prevails. In the case of Collins vs. The State, 98 Ill., 584, the court say in substance that an accomplice is a competent witness, and a conviction may be had upon his uncorroborated testimony if it satisfies the jury beyond a reasonable doubt; "but courts, in their discretion, may advise a jury not to believe an accomplice unless he is confirmed, or only in so far as he is confirmed. It is a matter of discretion with the court to so advise, rather than a rule of law."

In the case of The State vs. Russell, 33 La., Ann., 135, the court say: "On the subject of the testimony of accomplices, the authorities, to our mind, not only authorize its introduction, but justify conviction by the jury on such testimony, although it may not be corroborated by other." State vs. Prudhomme, 25 La. Ann., 522.

The charge of the court was full and explicit upon this subject, and the jury had the whole case fairly submitted to them.

The defendants, Bidwell and Andrews, by the testimony of witnesses who had formerly known them respectively in the States of New York and Iowa, proved their characters to have been good during the time they resided there. Bidwell produced the evidence of four witnesses, who all

testified that during an acquaintance with him in the city of Buffalo, of from ten to twenty years or more previous to the year 1876 (when he moved from Buffalo to Florida), he had an excellent reputation as a peaceful, law-abiding citizen. Andrews produced the evidence of six witnesses who had known him in Cass county, Iowa, for five or six years previous to his coming to Florida, in 1881, and they, severally, gave to him a good character. There was no proof as to the reputation of either of the defendants since they removed to this State, some years since. It is true that in capital cases the good character and reputation of a defendant among his neighbors in the community in which he lives is of value, especially in doubtful cases, and sometimes will create a doubt in the minds of a jury when, without such evidence, none would exist. Such evidence is intended for the consideration of the jury, and it is for the jury alone to determine whether, when considered with the other evidence in the case, it creates a reasonable doubt as to the defendant's guilt. The charge of the court on this point was in every respect correct. The court said: "Defendants have a right to put in evidence as a defence their good character. This should be considered by you in connection with the rest of the evidence as a part of the whole, from which you are to determine your verdict, and it should have such weight and effect as you, in connection with all the evidence, believe it entitled to."

The jury had before them also the evidence of George N. Shepard, introduced to prove an *alibi* on the part of the defendant, Bidwell. They had the opportunity of seeing the witness and hearing his evidence upon the stand. He swears that he was with Bidwell from in the morning until ten o'clock at night, of the night when it was said Riley was sentenced, and that Bidwell was not away from his

home on that evening. The charge of the court upon this point was clear and conclusive as to the law. The court said : " A defendant has the right to prove by competent evidence that he was not present and could not have committed the crime. If, from the evidence, you believe he was not present, you must acquit. The evidence of an *alibi* must cover the whole time when the presence of the accused was required. You must determine whether from the evidence the defendant has proved that he was not there or not. If you have a reasonable doubt in your mind as to whether he was there or not, you must find him not guilty. The defence of *alibi* is, of all others, the most decisive, when duly substantiated ; but the evidence adduced in support of it requires to be minutely considered, and must be such as to render it impossible that the crime could have been committed by the party that claims he was not present, and could not be guilty as charged."

The counsel for Bidwell claims that a new trial should be granted, because Adam W. Hunter, who had been jointly indicted and tried with the other defendants, had been acquitted by the jury and could now be used as a witness to prove that he, Hunter, took Bidwell's No. 12 breech-loading double-barrel shot gun and gave it to Charles B. Willard, and that he was informed that Willard gave it to Joseph C. Anderson ; that the gun was so taken without the knowledge or consent of Bidwell. Hunter made such an affidavit, which was used upon the motion for a new trial.

The rule found in the text-books is, that " a new trial will not be granted on behalf of a defendant convicted in a criminal case because a co-defendant tried at the same time and acquitted is a material witness for the defendant." Wharton's Am. Crim. Law, §3192 ; Graham & Waterman on New Trials, 1107.

Edmond P. Bacon et al. v. The State of Florida—Opinion of Court.

In the People vs. Vermilyea, 7 Cowen, 369, it was held that a new trial will not be granted, on motion of a defendant convicted in a criminal case, on the ground that a co-defendant tried at the same time and acquitted was a material witness for the convicted defendant. Savage, C. J., speaking for the court, says: "He has become a competent witness in virtue ot his acquittal; but the absence of all authority on the point is a strong argument against the sufficiency of this ground for granting a new trial. Such a rule would be highly inconvenient to practice. The proper course was, if the testimony against Davis was slight, to have the jury pass on his case and then introduce him as a witness on behalf of his co-defendants." There might be circumstances which would authorize the granting of a new trial for this reason, especially where the evidence was very conflicting, and the Judge conscientiously believed that the verdict was against the truth and against the weight of the evidence. In this case the defendants had a fair trial before a jury of their own selection. The verdict is not against the evidence, the witnesses were more or less corroborated by other testimony; there is no allegation that improper influences were brought to bear on their deliberations; or that they were, in any manner, controlled by passion or prejudice. They were judges of the credibility of the witnesses, and of the effect of the evidence. The Judge who tried the cause, saw the several witnesses as they were examined, and had full and perfect knowledge of all that transpired on the trial, refused the motion for a new trial. We can see no good reason to reverse his action, and must, therefore, affirm the judgment.